UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DALVIN DENSON,

                Petitioner,

v.                                          Case No. 3:20-cv-890-MMH-PDB

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS
and FLORIDA ATTORNEY GENERAL,

                Respondents.

_____

## **<u>ORDER</u>**

### **I. Status**

Petitioner Dalvin Denson, an inmate of the Florida penal system, initiated this action on August 4, 2020,[1] by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Petition; Doc. 1). Denson challenges a 2012 state court (Duval County, Florida) judgment of conviction for attempted first-degree felony murder (two counts), attempted robbery, and carrying a concealed firearm. He asserts four grounds for relief. <u>See generally</u> Petition. Respondents oppose the Petition (Response; Doc. 8) with exhibits (Docs. 8-1, 8-

_____

[1] <u>See</u> <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988) (mailbox rule).

2, 8-3, 17-1 through 17-14).[2] Denson filed a reply (Reply; Doc. 12). This case is ripe for review.

## II. Relevant Factual and Procedural History

In Duval County Case Number 2011-CF-11104, the State of Florida (State) charged Denson by way of a second amended information with six crimes: two counts of attempted first-degree felony murder (counts one and two); one count of attempted armed robbery (count three); two counts of attempted second-degree murder (counts four and five); and one count of carrying a concealed firearm (count six). Doc. 8-1 at 76-77. Denson proceeded to trial on October 11, 2012. Doc. 8-2 at 159. The State's primary witnesses were the two victims, Suad Rizvanovic and Meho Pasic, and the lead investigator, Detective Kevin Munger. Id. at 161.

Evidence adduced at trial showed the victims, Rizvanovic and Pasic, were teenage (and high school) friends in the "business" of selling small amounts of marijuana to people they knew. Id. at 204, 232-34. On September 1, 2011, Rizvanovic received a call from a young man identifying himself as "Darius" and asking to buy a quarter pound of marijuana. Id. at 203-04, 272-

---

[2] Respondents omitted exhibits E through R when they filed their Response. See Docs. 8-1 through 8-3. At the Court's direction, see Order (Doc. 16), Respondents filed the missing exhibits. See Doc. 17. Because the exhibits are not docketed together, the Court will cite them by document and page number as assigned by the Court's electronic docketing system.

73, 301-03. Rizvanovic and Pasic did not typically sell marijuana in such large amounts, but they decided to do so. Id. at 203-06, 209, 274-75. Rizvanovic and Pasic agreed to meet "Darius," who they later learned was Petitioner Dalvin Denson, near Englewood High School,[3] which was close to Rizvanovic's house. Id. at 209, 237, 275. The three met at about 11:00 p.m. Id. at 205-06, 275. Pasic gave Denson a sample of the marijuana, but Rizvanovic and Pasic became wary of Denson's intentions when they saw that Denson had only a few crumpled one-dollar bills. Id. at 211-12, 278, 280-81. Pasic also testified that he noticed what he thought was a gun tucked under Denson's shirt, so he thought Denson was "going to rob [them]." Id. at 280.

When Rizvanovic and Pasic realized Denson did not have nearly enough money to complete the transaction, they called it off and walked back to Rizvanovic's house, which was about forty to fifty yards from the high school. Id. at 211-12, 240, 281-82. As they approached the house, they heard "running footsteps" behind them. Id. at 213, 282-83. Both men turned around. Id. at 214-15, 283. Rizvanovic saw Denson with a gun, and Pasic heard Denson say, "give me that shit." Id. at 214-15, 283-84. Denson shot at them, hitting both more than once. Id. at 215, 284. Pasic drove the two of them to Memorial Hospital,

---

[3] The school name is misspelled in the record as "Inglewood."

but Rizvanovic's injuries were so extensive he had to be transported to Shands Hospital for surgery. Id. at 216-18, 248, 286, 290, 347.

On the night of the incident, both Rizvanovic and Pasic recognized Denson from school: Rizvanovic recognized Denson because he (Rizvanovic) had "dealt with him [Denson] before"; Pasic recognized Denson because they had gym class together, and Pasic had played basketball with Denson "once or twice." Id. at 210, 257, 278-79, 291-92. While Rizvanovic and Pasic both recognized Denson, they did not know him as anyone other than "Darius" at the time. Both tried to figure out the assailant's identity after the incident, and a friend of Pasic's told him he believed the person Pasic physically described was named "Dalvin." Id. at 256, 292, 325. Pasic's friend did not know Dalvin's last name, though, so Rizvanovic and Pasic searched for a "Dalvin" on Facebook. Id. at 292-93, 325. They found a picture in which they recognized Denson's "body figure," though the face was blurry. Id. at 225, 326. The name associated with the picture was "Hilltop Dalvin," information Rizvanovic and Pasic shared with Detective Munger on about September 14, 2011. Id. at 226-27, 294; Doc. 17-1 at 32.

On September 20, 2011, Detective Munger showed Rizvanovic and Pasic a photospread. Doc. 8-2 at 227-28, 295. Looking at the photospread separately, neither Rizvanovic nor Pasic identified the assailant. Id. at 228, 295, 354; Doc.

17-1 at 8. Detective Munger prepared a second photospread the same day after learning another detective was investigating a separate shooting incident involving a man named Darius. Doc. 8-2 at 228, 295-96, 354-55. Neither Pasic nor Rizvanovic identified the assailant in the second photospread, which they again viewed separately. Id. at 228, 295-96, 355; Doc. 17-1 at 8. Detective Munger did not include Dalvin Denson's photograph in either the first or second photospreads.[4] Doc. 8-2 at 357. On September 21, 2011, Detective Munger showed Rizvanovic and Pasic a third photospread, in which he included Denson's photo as well as five "filler" photos that were different from the ones included in the earlier photospreads. Id. at 229, 296; Doc. 17-1 at 6-7. Viewing the photospread separately, both Rizvanovic and Pasic identified Denson as the assailant "[a]lmost immediately." Doc. 8-2 at 229, 297; Doc. 17-1 at 7.

No DNA evidence connected Denson to Rizvanovic or Pasic on the night of the incident, but phone records did. Doc. 8-2 at 350-53. After the shooting, both Rizvanovic and Pasic gave their cells phones to officers and relayed that a man named "Darius" had called them both multiple times. Id. at 224, 292,

---

[4] Detective Munger intended to include Denson's photo in the original photospread, and he thought he had, but the photo he thought was Denson (ID #1206545) was not. Doc. 8-2 at 358. Detective Munger discovered the mistake when he accessed Denson's driver's license photo. Id.

349. On about October 4, 2011, Detective Munger obtained MetroPCS cell phone records for the phone number that appeared in both Rizvanovic's and Pasic's phones. Id. at 349-50. See also Doc. 8-1 at 172. That number was registered to a person named "Hilltop Dalvin." Doc. 8-2 at 224, 292, 349-50. See also Doc. 8-1 at 173.

The phone records for the number registered to "Hilltop Dalvin" showed the following relevant call activity on September 1, 2011, between 8:34 p.m. and 11:02 p.m.: five outgoing calls to and three incoming calls from Rizvanovic's cell phone number; and six outgoing calls to and two incoming calls from Pasic's cell phone number. Doc. 8-1 at 173, 179.[5] Rizvanovic, Pasic, and Detective Munger testified that the incident occurred shortly after 11:00 p.m. Doc. 8-2 at 206, 275, 337-38; Doc. 17-1 at 40-41. Through his investigation, Detective Munger discovered the name "Hilltop Dalvin" was associated with "Dalvin Lorenzo Denson." Doc. 8-2 at 352-53.

At trial, Rizvanovic and Pasic testified that, on the night of the incident, Denson was wearing a "tall T-shirt," one that "goes down to your knees," had long twisted hair, or "little dreads," and a "distinctive chipped tooth." Id. at 223-24, 243, 245, 279. It does not appear either Rizvanovic or Pasic gave these

---

[5] The three initially communicated using Rizvanovic's phone, but when Rizvanovic's phone died, they used Pasic's. Doc. 8-2 at 204-05, 274.

details to police when they were initially interviewed at the hospital or at Rizvanovic's house two days after the incident. Doc. 17-1 at 15-16, 19-20. Detective Munger testified that his initial report included no information about the assailant's physical description, such as height, weight, age, hair style or color, clothing, or distinguishing marks or features. Id. at 17-18. However, Detective Munger confirmed that, when he interviewed Rizvanovic and Pasic at Rizvanovic's house on September 3, 2011, they both told him they went to school with the assailant. Id. at 43-44. At trial, both Rizvanovic and Pasic acknowledged that they had smoked marijuana on the day of the incident and were still feeling some of the effects when they met Denson, but both were certain that Denson was the one who contacted them, attempted to rob them, and shot them. Doc. 8-2 at 268-69, 207, 275, 277-78, 333.

After a one-day trial and only about forty minutes of deliberation, the jury returned a guilty verdict on all counts. Doc. 17-1 at 188-90. See also Doc. 8-3 at 58-66. On November 15, 2012, the trial court imposed a life sentence as to counts one and two, a twenty-five-year sentence as to count three, and a five-year sentence as to count six, with consecutive mandatory-minimum terms of imprisonment for the attempted murder and robbery convictions (counts one through three). Doc. 8-3 at 67-76. See also Doc. 8-1 at 269-72, 305-07. Denson filed a motion to correct his sentence on July 12, 2013, Doc. 17-2 at 4, which

the trial court orally granted in part on August 6, 2013, crediting Denson with 407 days of jail time as to count three, id. at 19, 26. The court entered a written order on the matter on September 4, 2013, id. at 32, 35, and an amended judgment on November 15, 2013, id. at 19-20.

Denson appealed his conviction to Florida's First District Court of Appeal (First DCA) on November 25, 2013, arguing that his convictions for both first and second-degree attempted murder violated double jeopardy, and that the trial court had the discretion to run his sentences concurrently. Doc. 17-3 at 2-3, 38. In its answer brief, the State conceded the point as to the double jeopardy argument, noting that, at the sentencing hearing, the trial court acknowledged the potential for an "illegal sentence," and thus, did not sentence Denson on counts four and five. Doc. 17-4 at 8-9. See also Doc. 8-1 at 296, 307. But the trial court did not vacate the jury's verdict as to those counts. Doc. 17-4 at 8. As such, the First DCA set aside Denson's verdict "insofar as [the jury] found him guilty of two counts of attempted second-degree murder," but affirmed the amended judgment and sentence as to the remaining counts. Doc. 17-6 at 7, 8.

On September 26, 2014, Denson filed a brief in the Florida Supreme Court seeking discretionary review of the First DCA's ruling with respect to his sentences running consecutively because the cases upon which the First

DCA relied were pending review in the Florida Supreme Court. Doc. 17-8 at 2, 7-9. The State agreed that the Florida Supreme Court should remand the case for reconsideration. Doc. 17-10 at 3. Accordingly, on May 26, 2017, the Florida Supreme Court accepted jurisdiction of the case, quashed the First DCA's decision, and remanded the case for reconsideration. Doc. 17-11. On remand, the First DCA "reverse[d] Denson's consecutive sentences and remand[ed] so the trial court [could] exercise its discretion in determining whether the mandatory-minimum terms should be consecutive or concurrent." Doc. 8-3 at 96-97.

On January 4, 2018, Denson filed a motion for reduction of sentence in accordance with the First DCA's July 14, 2017 mandate. Doc. 17-12. See also Doc. 8-3 at 95. The trial court granted Denson's motion on May 2, 2018. Doc. 17-13. As reflected in the modified amended judgment, Denson is now serving a twenty-five-year term of incarceration as to count one, a thirty-year term of incarceration as to count two, a twenty-five-year term of incarceration as to count three, and a five-year term of incarceration as to count six, all running concurrently. Doc. 17-14.

On January 7, 2019, Denson filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, raising multiple grounds of ineffective assistance of trial counsel. Doc. 8-3 at 5, 8. The

postconviction court denied relief, and Denson appealed. Id. at 47-57, 515, 518. The First DCA per curiam affirmed the denial of relief. Id. at 579. Following the denial of Denson's motion for rehearing, the First DCA issued its mandate on April 14, 2020. Id. at 582, 587.

### III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

### IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Denson's] claim[s] without

further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

### V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter,

562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As

explained by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Id.</u> at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." <u>See</u> <u>Burt v. Titlow</u>, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); <u>accord</u> <u>Brumfield v. Cain</u>, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[6] <u>Titlow</u>, 571 U.S. at

---

[6] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." <u>Clark v. Att'y Gen., Fla.</u>, 821 F.3d 1270, 1286 n.3 (11th Cir. 2016).

> ---, 134 S. Ct. at 15 (quoting <u>Wood v. Allen</u>, 558 U.S.
> 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

<u>Tharpe v. Warden</u>, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record before the state court that adjudicated the claim on the merits. <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" <u>Tharpe</u>, 834 F.3d at 1338 (quoting <u>Richter</u>, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. <u>Richter</u>, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

### B. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby

14

prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (first citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003); and then <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [<u>Strickland</u>,] 466 U.S. at 688, 104 S. Ct. 2052.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. <u>Id.</u>, at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>, at 687, 104 S. Ct. 2052.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687, 104 S. Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a

court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at ---, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at ---, 131 S. Ct. at 788.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014); Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the

16

deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference — this one to a state court's decision — when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As Ground One, Denson argues his trial counsel was deficient for failing to locate and call as a witness the school friend who told Pasic Denson's first name. Petition at 3. <u>See also</u> Reply at 3. Denson contends the "unknown witness . . . supplied testimonial evidence," and his attorney's failure to locate him or her deprived him of his right to confront the witnesses against him. Petition at 3-5. According to Denson, the assailant's identification was a key issue at trial because: Rizvanovic and Pasic failed to identify Denson through the first photospread presented by Detective Munger;[7] no physical evidence connected Denson to the shooting; Detective Munger "exercised an unnecessarily suggestive police procedure" by compiling photospreads after

---

[7] As previously noted, Denson's photo was not included in the first or second photospreads. Doc. 8-2 at 357.

Rizvanovic and Pasic told him they learned the name "Dalvin" from a friend; neither Rizvanovic nor Pasic testified at trial that the voice of the person they spoke to on the phone matched that of the voice of the person they met near the high school; and Rizvanovic and Pasic only gave officers a "detailed description" of the assailant after having received the name "Dalvin" from a friend. Id. at 4-5, 9-10. See also Reply at 5-6.

Denson raised this claim as ground one of his Rule 3.850 Motion. Doc. 8-3 at 10. In denying relief, the postconviction court stated:

> When "the inescapable inference from . . . testimony is that a non-testifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay, and the defendant's right of confrontation is defeated, notwithstanding that the actual statements made by the non-testifying witness are not repeated." Postell v. State, 398 So. 2d 851, 854 (Fla. 3d DCA 1981); accord Walker v. State, 77 So. 3d 890, 894 (Fla. 2d DCA 2012) ("Where the inference from a statement of a mystery witness is that the witness has furnished evidence of the defendant's guilt, the testimony is hearsay and violates the defendant's right to confrontation.").
>
> In Defendant's case, he is not entitled to relief because no witnesses implied that non-testifying witnesses had furnished evidence of his guilt. Both victims testified at trial. One victim testified that he "came across a name soPasicw." (Ex. K at 228). Nothing about his statement was objectionable, so counsel was not deficient for failing to object. See Hitchcock v. State, 991 So. 2d 337, 361 (Fla. 2008) (citing Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992)). The other victim testified as follows:

18

> [The State]:   Okay. Subsequent to Detective Munger leaving this first time, did you try and find out who shot you?
>
> [Witness]:  Yes.
>
> [The State]:   How did you go about doing that?
>
> [Witness]:  Well, I recognized him from Inglewood [sic], like you said,[8] and like I said. Um, I got ahold of a few friends and explained the -- described this person, Mr. Dalvin Denson, and I didn't get a name at first, and later on I had a friend call me and he said, "Hey, you know, I know who you're talking about." And I'm like, "Yea, do you know his name?" He tells me, "Yes, his name is Dalvin." And I'm like, "Yeah, that's who. Do you know his last name?" He didn't know his last name.
>
> [The State]:   Okay. That name that you got of Dalvin?
>
> [Witness]:  Yes.

(Ex. K at 296-97). Even if this Court were to find this is objectionable hearsay, it is not prejudicial evidence. Both victims knew Defendant from school and could recognize him if they saw him. (Ex. K at 206, 283). They knew details about him such as his chipped tooth and short dreads. (Ex. K at 228, 283). They had his phone number and talked with him just before the shooting. (Ex. K at 207, 276). The only piece of information relayed by a non-testifying witness was the name "Dalvin," and this name was given in

---

[8] Just prior to this exchange at trial, the prosecutor asked Pasic, "[T]he person that you identified, or that you saw, this defendant, you recognized him from school[,] right?" Doc. 8-2 at 291.

response to a description provided by testifying victims. (Ex. K at 296-97). There is no reasonable probability the admission of this evidence contributed to the ultimate outcome of Defendant's trial. See State v. Dickson, 89 So. 3d 277, 279-80 (Fla. 1st DCA 2012). Additionally, because the non-testifying witness has no direct knowledge of the shooting, there is no reasonable probability that the ultimate outcome of Defendant's trial would have been different had counsel located the witness. Accordingly, Defendant is not entitled to relief on Ground One.

Id. at 50-52. The First DCA affirmed the denial of relief without a written opinion. Doc. 8-3 at 579.

To the extent the First DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.[9] After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an

---

[9] Throughout this Order, in looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1194. In Grounds One and Two of his Petition, Denson argues the state court did not adjudicate his ineffective assistance of counsel claims "on the merits" because the postconviction court addressed only the "prejudice" prong of the Strickland test, not the "deficient performance prong." See Petition at 7, 13-14. This argument is without merit. The postconviction court properly set forth the Strickland test, emphasizing that a defendant "must demonstrate both ineffectiveness and prejudice." Doc. 8-3 at 49-50 (emphasis in original). If a defendant cannot demonstrate one prong, a court need not address both. See Strickland, 466 U.S. at 697. In fact, in Strickland, the Supreme Court advised that courts should "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" when that course is easier. Id.

unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Denson is not entitled to relief on Ground One.

Even if the state court's adjudication of the claim were not entitled to deference, Denson's ineffectiveness claim is without merit. The Confrontation Clause does not bar the admission of a statement from an absent witness if the statement is not testimonial in nature. Crawford v. Washington, 541 U.S. 36, 51 (2004). "Statements made in the course of an out-of-court conversation are testimonial if in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." United States v. Hano, 922 F.3d 1272, 1287 (11th Cir. 2019) (internal quotation marks omitted) (quoting Ohio v. Clark, 576 U.S. 237, 135 S. Ct. 2173, 2180 (2015)). For instance, "[a]n accuser who makes a formal statement to [a] government officer[] bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford, 541 U.S. at 51.

In Hano, the Eleventh Circuit held that statements made by the defendant's accomplice to an acquaintance were not testimonial because they were made during an informal conversation and before the defendant or the

accomplice had become suspects. 922 F.3d at 1287. The court reasoned, "What transpired between [the accomplice and the acquaintance/witness] was a friendly and informal exchange in which [the accomplice] happened to reveal evidence that would ultimately be critical to the government's case" against the defendant. Id. See also United States v. Brown, 441 F.3d 1330, 1360 (11th Cir. 2006) (holding a phone conversation between the defendant and his mother was not testimonial and could be relayed at trial by the person who overheard the mother's end of the conversation, because the phone conversation "was not made under examination, was not transcribed in a formal document, and was not made under circumstances leading an objective person to reasonably believe the statement would be available for use at a later trial").

As in both Hano and Brown, the out-of-court conversation here was "a friendly and informal exchange in which [a friend] happened to reveal evidence that would ultimately be critical to the government's case." See Hano, 922 F.3d at 1287; Brown, 441 F.3d at 1360. The conversation between Pasic and his friend occurred before Denson became a suspect, the conversation "was not made under examination, was not transcribed in a formal document, and was not made under circumstances leading an objective person to reasonably believe the statement would be available for use at a later trial." See Brown,

441 F.3d at 1360. Indeed, Detective Munger explained at trial that Rizvanovic and Pasic learned the name Dalvin and found a photo of him through their own efforts, with no assistance from or involvement by the sheriff's office. Doc. 17-1 at 31. In considering the circumstances of the conversation, the statement Pasic shared at trial was not testimonial.

Moreover, it does not appear the statement was offered as evidence of the truth of the matter asserted—that Dalvin was the assailant—but rather to demonstrate the effect it had on the listener (Pasic). In other words, the statement explained why Rizvanovic and Pasic searched the name "Dalvin" on Facebook, leading them to a picture in which they recognized Denson's body. Because the statement was not testimonial and was not offered for the truth of the matter asserted, Denson's attorney cannot have been ineffective for failing to call the Pasic's friend as a witness at trial.

However, even assuming arguendo deficient performance by counsel, Denson has not shown any resulting prejudice. Independent of having heard the name "Hilltop Dalvin" from Rizvanovic and Pasic, Detective Munger came across that same name through his own investigation. Using Rizvanovic's and Pasic's phones, which officers took the night they were shot—and before Pasic learned the name "Dalvin" from a friend—Detective Munger obtained the phone number "Darius" used to communicate with Rizvanovic and Pasic on the

23

night of the incident. Phone records for that number showed it was registered to "Hilltop Dalvin" and further showed multiple incoming and outgoing calls to both Rizvanovic's and Pasic's phones in the hours and minutes before the incident. Detective Munger traced the name "Hilltop Dalvin" to "Dalvin Lorenzo Denson" and discovered that Denson lived at the address associated with the phone account registered to "Hilltop Dalvin." Doc. 8-2 at 351-53. Moreover, Detective Munger showed Rizvanovic and Pasic three photospreads, only the third of which included Denson's photo, and both Rizvanovic and Pasic, viewing the photos separately, almost immediately selected the photo of Denson in the third photospread. Doc. 17-1 at 6-8.

Denson argues Rizvanovic's and Pasic's separate identifications of him are not "worth anything" because Rizvanovic and Pasic had time to speak with one another beforehand and after they found a photo of "Dalvin" on Facebook. Petition at 4-5. See also Reply at 5. He points to the following exchange between his attorney and Detective Munger at trial:

> Q    . . . with the photospread you went over the actual photo instructions[,] right?
>
> A    Yes.
>
> Q    And those are given to everybody that does a photospread, especially these two individuals?
>
> A    Rizvanovic and Pasic?

Q      Yes.

A      Yes, sir.
. . .
Q      And, obviously, [one] part of the
instruction is that you can't give any assistance, but
really no one should give any assistance in picking out
a photo[,] right?

A      Right.

Q      Whether it's an officer, a witness, or
anything[,] right?

A      It wouldn't be worth anything if they did.

Doc. 17-1 at 33-34. Contrary to Denson's interpretation of this exchange,

Detective Munger did not testify that a photospread identification is worthless

when two victims of the same crime separately choose the same photo even

though they had time to talk to one another beforehand. Regardless, both

Rizvanovic and Pasic testified at trial that they recognized Denson from school

when they met him on September 1, 2011, and they were certain when

testifying that Denson was the person who tried to rob them and shot them.

Doc. 8-2 at 269-70, 277-78, 333. Moreover, Detective Munger confirmed that

both Rizvanovic and Pasic viewed all three photospreads separately, and there

was no evidence that anyone assisted either in picking the photo of Denson.

Doc. 17-1 at 8.

Denson has not shown a reasonable probability exists that the outcome of the case would have been different if counsel had called Pasic's friend as a witness. His ineffectiveness claim is without merit because he has shown neither deficient performance nor resulting prejudice. Accordingly, Denson is not entitled to federal habeas relief on the claim raised in Ground One.

## B. Ground Two

As Ground Two, Denson argues counsel was ineffective for failing to object to "inadmissible hearsay." Petition at 11. See also Reply at 7. He contends his counsel should have objected when Pasic testified that he learned the name "Dalvin" from an "unidentified third party." Petition at 11-13. Denson raised this claim as ground two of his Rule 3.850 Motion. Doc. 8-3 at 19. Acknowledging grounds one and two of Denson's Rule 3.850 Motion were "intertwined," the postconviction court denied relief, finding the "testimony did not prejudice Defendant." Id. at 52. The First DCA per curiam affirmed the denial of relief without a written opinion. Doc. 8-3 at 579.

To the extent the First DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an

26

unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Denson is not entitled to relief on the basis of this ineffectiveness claim. Even if the appellate court's adjudication of the claim were not entitled to deference, Denson's ineffectiveness claim is without merit for the reasons stated in Ground One. See supra pp. 21-25. Accordingly, Denson is not entitled to federal habeas relief on Ground Two.

## C. Ground Three

As Ground Three, Denson argues counsel was ineffective for failing to request "the standard jury instruction for misidentification." Petition at 15. See also Reply at 11. He contends, "[t]here was no evidence [tying him] to the crime other than a highly questionable identification made by both victims," and, therefore, his counsel should have requested the court give Florida's Standard Jury Instruction 3.9(c), formerly 3.9(f). Petition at 15-16, 16 n.3. He says the failure to request the instruction was prejudicial because, in consideration of the factors listed in that instruction, a jury could have concluded Rizvanovic's and Pasic's identification of Denson lacked credibility. Id. at 15-16.

Denson raised this claim as ground five of his Rule 3.850 Motion. Doc. 8-3 at 36. In denying relief, the postconviction court stated:

> As a preliminary matter, Florida Standard Jury Instruction 3.9(c) was not approved by the Florida Supreme Court until <u>after</u> Defendant's trial. <u>In Re Standard Jury Instructions in Criminal Cases—Report No. 2011-05</u>, 141 So. 3d 132 (Fla. 2013). The Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed <u>as of the time of counsel's conduct.</u>" <u>Diaz v. State</u>, 810 S. 2d 1023, 1025 (Fla. 2d DCA 2002) (emphasis added). As such, counsel cannot be deemed ineffective for failing to anticipate changes in the law or in the standard jury instructions. <u>Id.</u> Thus, Counsel [sic] cannot be ineffective for failing to request a standard jury instruction that did not exist.
>
> However, even if this Court were to find that counsel should have requested the instruction or crafted a similar special instruction, Defendant is still not entitled to relief. <u>See</u> <u>Grandison v. State</u>, No. 1D17-4266, 2019 WL 942975, at *1-2 (Fla. 1st DCA Feb. 27, 2019). In <u>Grandison</u>, appellant argued that trial counsel failed to address the wife's eyewitness identification appropriately; he did not investigate and challenge it at trial, call an expert, discuss it during voir dire, request the standard jury instruction, or argue it during closing. However, the court ruled that Appellant [sic] failed to show either deficiency or prejudice. The Court held:
>
> > Florida has a special instruction for eyewitness testimony. It instructs jurors to consider the typical witness factors and then informs them they may also consider other enumerated factors as to eyewitnesses: length of time of the observation, timing of the observation, suggestiveness, inconsistent identifications, failure to identify, familiarity

with the person, time between the incident and identification, and similarity of race or ethnicity. Fla. Std. Jury Instr. (Crim.) 3.9(c).

Here, counsel did not request the instruction. But he spoke to the jury about the wife's eyewitness identification and used the components from the instruction in that discussion.
. . .
Thus, the jury could easily make its own determination on identification, and counsel requested the jury critically evaluate the wife's identification. The lack of the detailed eyewitness instruction and counsel's decision not to call an expert are not deficient—a decision outside the "wide range of reasonable professional assistance." Appellant failed to show deficiency.

Moreover, in light of the same facts, the lack of instruction and counsel's performance surrounding the wife's identification did not prejudice Appellant. First, counsel challenged the wife's identification through cross-examination, and he highlighted his challenge in closing. Second, he used the instruction—whether it was officially given to the jury or not. Third, there was evidence independent of the wife's identification; this case did not hinge on her identification. Fourth, the jury could make its own determination about that independent evidence. It could review the video and still photos of the robbery, look at the barely disguised man, and compare that to Appellant—all without factoring any eyewitness identification. Appellant therefore failed to show any deficiency undermined confidence in the trial's outcome or that he was

29

> deprived of that, a fair trial with a reliable result. Therefore, he not was prejudiced.
>
> Grandison v. State, No. 1D17-4266, 2019 WL 942975, at *1-2 (Fla. 1st DCA Feb. 27, 2019).
>
> Likewise, in this matter, counsel relied upon the evidence presented at trial and argued the misidentification of the Defendant. Counsel attacked the victims' identifications of Defendant as unreliable, utilizing some of the factors outlined above. (Ex. K at 477-83). Because of this, counsel was not deficient in failing to request a special instruction on misidentification. Moreover, there is no reasonable probability that the ultimate outcome of the Defendant's case would have been different had the jury received an instruction on misidentification. Accordingly, Defendant is not entitled to relief on Ground Five.

Id. at 54-56. The First DCA per curiam affirmed the denial of relief without a written opinion. Id. at 579.

To the extent the First DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings. Thus, Denson is not entitled to relief on Ground Three.

Even if the state court's adjudication of the claim were not entitled to deference, Denson's ineffectiveness claim is without merit because he fails to demonstrate his counsel was deficient for not requesting an instruction that was not adopted until after his 2012 trial. Florida's Standard Jury Instruction for "eyewitness identification," which originally was numbered as 3.9(f), "was adopted in 2013." In re Standard Jury Instructions in Crim. Cases--Rep. No. 2011-05, 141 So. 3d 132, 137 (Fla. 2013); In re Standard Jury Instructions in Crim. Cases--Rep. 2017-09, 238 So. 3d 192, 195 (Fla. 2018) (noting in the "[c]omment" that the instruction was adopted in 2013). See also In re Standard Jury Instructions in Crim. Cases--Rep. 2012-07, 122 So. 3d 302, 310 (Fla. 2013) (renumbering the "eyewitness identification" instruction as 3.9(c)). Denson's counsel cannot have been deficient for failing to request a standard instruction that had not yet been adopted.

However, accepting that Denson's counsel should have requested a special instruction regarding "eyewitness identification," Denson fails to demonstrate there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Richter, 562 U.S. at 104. First, to the extent Denson believes Rizvanovic's

and Pasic's identifications of him were unreliable, his counsel argued as such in closing, emphasizing many of the factors set forth in jury instruction 3.9(c), specifically those listed in sub-paragraphs two (influence/suggestiveness), three (circumstances of the identification), seven (timing), and nine (totality of the circumstances): when first interviewed by police, Rizvanovic and Pasic did not describe the assailant as having a chipped tooth or short dreads or as wearing a long T-shirt, but rather, their physical description of the assailant evolved after they learned the name "Dalvin" and found a picture on Facebook; Rizvanovic and Pasic identified Denson in the photospread "almost immediately," but only after they had already learned from an unidentified friend at school the name "Dalvin," a person with whom they had had some interaction before the incident; and after learning the name "Dalvin" but before viewing the photospreads, Rizvanovic and Pasic had time to talk to one another. Doc. 8-2 at 114, 117-18, 127-29, 132-33. See also Fla. Std. Jury Instr. (Crim.) 3.9(c).

Counsel argued as follows:

> [W]e're not suggesting [Rizvanovic and Pasic] came up with this big plan, however, once they figured out, or somebody told them, Yeah, this is probably the guy, all of a sudden all of these details are flying through, and we have no idea what . . . they did in those three weeks. We don't know if they talked to somebody else, we don't know what pictures they looked at, we don't know what Facebook they looked

at, we don't know if they had a fight with somebody, they didn't like this guy. We have no idea. There were three weeks of timeframe there, these two were together, and, clearly, becoming more and more sure that it was this guy [Denson]. As [Pasic] said 200 percent, 200 percent sure. None of that description was in the first report. And on September 3rd, the closest to the incident, we had none of those details.

. . .

So all this immediately identifying the photo lineup, and immediately this and immediately that, what does that even mean? Is that reliable for anything? They already . . . had gotten the identification from somebody else, so, of course, they immediately identified him, that they know who they are talking about. . . . Of course they identified him [Denson], they know who they're talking about.

Doc. 17-1 at 128-29, 132. Additionally, on cross-examination, counsel highlighted that Rizvanovic and Pasic were of a different ethnic background or race from the assailant—the assailant was a black male, while Rizvanovic and Pasic were of Bosnian and German descent, respectively—which correlates to yet another factor in the instruction, set forth in sub-paragraph eight. Doc. 8-2 at 201, 247-48, 268, 270-71, 326. See also Fla. Std. Jury Instr. (Crim.) 3.9(c). Even Denson concedes in his Petition that his counsel "effectively elicited testimony from both victims and from Detective Munger that met the criteria of virtually every element of . . . instruction [3.9(c)]." Petition at 15 (emphasis added).

Second, the result of the proceeding likely would not have been different had counsel requested a special instruction because there was evidence independent of Rizvanovic's and Pasic's identifications of Denson that connected Denson to Rizvanovic and Pasic on the evening of the incident. Rizvanovic and Pasic told police that a man called them multiple times on September 1, 2011, asking to purchase a quarter pound of marijuana, and Denson's phone records showed eleven outgoing calls were made to Rizvanovic's and Pasic's phones between 8:34 and 11:02 p.m. that evening. The incident happened at just after 11:00 p.m. Doc. 8-2 at 206, 337-38. Moreover, officers found about 129 grams (or just over a quarter pound) of marijuana in the car Rizvanovic and Pasic drove to the hospital that night. Id. at 349.

Denson has not shown a reasonable probability exists that the outcome of the case would have been different had counsel requested a special jury instruction on "eyewitness identification." His ineffectiveness claim is without merit because he has shown neither deficient performance nor resulting prejudice. Accordingly, Denson is not entitled to federal habeas relief on the claim raised in Ground Three.

### D. Ground Four

As Ground Four, Denson argues that the cumulative impact of his trial counsel's errors prejudiced him at trial. Where all individual claims are

34

meritless, the claim of cumulative error is also without merit. <u>Morris v. Sec'y,</u>
<u>Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each of Denson's
individual claims lack merit, Ground Four is due to be denied.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Denson seeks issuance of a certificate of appealability, the undersigned
opines that a certificate of appealability is not warranted. The Court should
issue a certificate of appealability only if the petitioner makes "a substantial
showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make
this substantial showing, Denson "must demonstrate that reasonable jurists
would find the district court's assessment of the constitutional claims
debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting
<u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were
'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>,
537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4
(1983)).

Where a district court has rejected a petitioner's constitutional claims on
the merits, the petitioner must demonstrate that reasonable jurists would find
the district court's assessment of the constitutional claims debatable or wrong.
<u>See</u> <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a
claim on procedural grounds, the petitioner must show that "jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.      If Denson appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate

any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of

September, 2023.


**MARCIA MORALES HOWARD**
United States District Judge




Jax-6
c:     Dalvin Denson
       Counsel of Record

37